IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-CV-00599-FL

**Stephanie Fitzmorris,**

          Plaintiff,

v.

**Frank J. Bisignano,** Commissioner of Social Security,[1]

          Defendant.

**Memorandum & Recommendation**

    Plaintiff Stephanie Fitzmorris challenges an Administrative Law Judge's decision to deny her application for social security income. Fitzmorris claims that the ALJ disregarded the effects of her persistent fatigue. Both Fitzmorris and Defendant Frank J. Bisignano, Commissioner of Social Security, seek a decision in their favor. D.E. 13, 15.

    After reviewing the parties' arguments, the court has determined that the ALJ erred in her determination. The ALJ declined to fully endorse Fitzmorris's symptoms, but the reasons she rejected her reports of fatigue are unclear. So further consideration of the matter is necessary. The undersigned thus recommends that the court grant Fitzmorris relief, deny Bisignano relief, and remand the matter to the Commissioner for further consideration.[2]

---

[1] The court substitutes Frank J. Bisignano for the former defendants. *See* Fed. R. Civ. P 25(d).

[2] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b).

I.  **Background**

   A.  **Factual**

The ALJ summarized the evidence as follows: Fitzmorris suffers from systemic lupus erythematosus, idiopathic thrombocytopenic purpura, and rheumatoid arthritis. Tr. at 23. These conditions caused symptoms including leg pain and swelling, nerve pain, and fatigue. *Id.* Fitzmorris had trouble with sitting, standing, walking, and lifting, as well as bending, kneeling, climbing stairs, and using her hands. *Id.* She remained able to shop, drive, prepare meals, perform household chores, and attend to personal care. *Id.*

Fitzmorris has reported experiencing leg swelling, pain and stiffness, headaches, and nausea each day from lupus. *Id.* She also suffers from fatigue and joint pain, and saw a pain management specialist. *Id.*

A July 2022 consultative evaluation disclosed no tenderness or swelling. *Id.* Fitzmorris displayed a normal gait, full strength, and full range of motion. *Id.* At visits to her providers, she complained of swelling, fatigue, and stiffness, along with a pins and needles sensation in her hands. *Id.*

Records in 2023 reflect Fitzmorris's continuing issues with her diagnoses. Tr. at 24. Early that year, she had ongoing pain and stiffness in her hands. *Id.* Fitzmorris complained persistent fatigue to her providers, which they primarily attributed to inflammation arthritis. *Id.* She had a flare-up of joint symptoms in July 2023 and medication occasionally helped her pain. *Id.* The next month, providers noted a generally normal physical examination. *Id.*

State agency physicians found that Fitzmorris could perform work at the light exertional level. *Id.* The consultative examiner concluded that she had mild restrictions in exertional, postural, and manipulative activities. *Id.*

B. **Procedural**

In May 2021, Fitzmorris applied for disability benefits alleging a disability that began that month. After the Social Security Administration denied her claim at the initial level and upon reconsideration, Fitzmorris appeared for a hearing before an ALJ to determine whether she was entitled to benefits. The ALJ determined Fitzmorris had no right to benefits because she was not disabled. Tr. at 17–26.

The ALJ found that Fitzmorris lived with several severe impairments. Tr. at 19. These included systemic lupus erythematosus, idiopathic thrombocytopenic purpura, and rheumatoid arthritis. *Id.* The ALJ also found that Fitzmorris's impairments, either alone or in combination, did not meet or equal a Listing impairment. Tr. at 22.

Next, the ALJ determined that Fitzmorris had the residual functional capacity (RFC) to perform a reduced level of light work with a restriction to frequent handling and fingering. *Id.*

Then the ALJ concluded that Fitzmorris could perform her past work as a pharmacy technician. Tr. at 25. And considering her age, education, work experience, and RFC, the ALJ found that other jobs existed in significant numbers in the national economy that Fitzmorris could perform. Tr. at 25–26. These jobs included merchandise marker, mail sorter, and routing clerk. *Id.* These findings led the ALJ to conclude that Fitzmorris was not disabled. Tr. at 26.

After the Appeals Council denied review, Fitzmorris commenced this action in October 2024. D.E. 1. Both parties ask the court to issue a decision in their favor. D.E. 13, 15.

II. **Analysis**

Fitzmorris argues that the ALJ's RFC determination is unsound because it glosses over her persistent fatigue symptoms. The ALJ gave only cursory consideration to this symptom and

3

offered no reasons to discount Fitzmorris's fatigue. This oversight impedes a meaningful review. So this issue require further consideration upon remand.

A.   **Standard for Review of the Commissioner's Final Decision**

When a claimant appeals the Commissioner's final decision, the district court considers whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively* v. *Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws* v. *Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). The court must affirm the Commissioner's decision if it is supported by substantial evidence. *Smith* v. *Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

B.   **Standard for Evaluating Disability**

Under the Social Security Act, a claimant is disabled if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). ALJs use a five-step, sequential process when considering disability claims. 20 C.F.R. § 404.1520.

First, at step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). If so, the claim is denied. *Id*.

Then, at step two, the ALJ looks at whether the claimant has a severe impairment or combination of impairments that significantly limit him from performing basic work activities. *Id.* § 404.1520(a)(4)(ii). If not, the claim is denied. *Id*.

4

Next, at step three, the ALJ compares the claimant's impairments to those in the Listing of Impairments. *Id.* § 404.1520(a)(4)(iii). If the impairment appears in the Listing or if it is equal to a listed impairment, the ALJ must find that the claimant is disabled. *Id.*

But if the ALJ concludes that a presumption of disability is unwarranted, the ALJ must then assess the claimant's residual functional capacity ("RFC"). A claimant's RFC "is the most work-related activity the claimant can do despite all of her medically determinable impairments and the limitations they cause." *Arakas* v. *Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 90 (4th Cir. 2020). Determining the RFC requires the ALJ to "first identify the claimant's 'functional limitations or restrictions' and assess the claimant's 'ability to do sustained work-related' activities 'on a regular and continuing basis'—i.e., '8 hours a day, for 5 days a week, or an equivalent work schedule.'" *Id.* (quoting SSR 96–8p, 1996 WL 374184, at *1 (July 2, 1996)). The ALJ will then "express the claimant's Residual Functional Capacity 'in terms of the exertional levels of work[:] sedentary, light, medium, heavy, and very heavy.'" *Id.* (alteration in original).

After assessing the claimant's RFC, the ALJ, at step four, considers whether the claimant can perform his past work despite his impairments. *Id.* § 404.1520(a)(4)(iv). If the claimant can, the ALJ will deny the claim. *Id.* If the claimant cannot, the analysis moves on to step five.

This final step considers whether the claimant, based on his age, work experience, and RFC, can perform other substantial gainful work. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled; if so, they are considered disabled. *Id*.

The burden of proof shifts between the Commissioner and the claimant during the evaluation process. The claimant has the burden of proof on the first four steps, but the Commissioner bears it on the last one. *Pass* v. *Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

5

### C. Fatigue

Fitzmorris argues that the residual functional capacity (RFC) determination fails to address her persistent fatigue symptoms. The Commissioner contends that the ALJ considered Fitzmorris's fatigue but concluded it required no other limitations aside from a restriction to light work. The undersigned finds that the ALJ discounted this symptom, which the record consistently documents, and failed to explain why it resulted in no additional nonexertional limitations in the RFC. So remand is necessary for further consideration of this issue.

#### 1. Residual Functional Capacity

The RFC is a determination, based on all the relevant medical and non-medical evidence, of what a claimant can still do despite her impairments; the assessment of a claimant's RFC is the responsibility of the ALJ. See 20 C.F.R. §§ 404.1520, 404.1545, 404.1546; SSR 96–8p, 1996 WL 374184, at *2. If more than one impairment is present, the ALJ must consider all medically determinable impairments, including medically determinable impairments that are not "severe," when determining the claimant's RFC. *Id.* §§ 404.1545(a), 416.945(a). The ALJ must also consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. *Id.* § 404.1523; *see Walker* v. *Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) ("[I]n evaluating the effect[] of various impairments upon a disability benefit claimant, the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them.").

The ALJ must provide "findings and determinations sufficiently articulated to permit meaningful judicial review." *DeLoatche* v. *Heckler*, 715 F.2d 148, 150 (4th Cir. 1983); *see also Wyatt* v. *Bowen*, 887 F.2d 1082, 1989 WL 117940, at *4 (4th Cir. 1989) (per curiam). The ALJ's RFC determination "must include a narrative discussion describing how the evidence supports

each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio* v. *Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting SSR 96–8p). Furthermore, "[t]he record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford* v. *Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). Fourth Circuit precedent "makes it clear that it is not [the court's] role to speculate as to how the ALJ applied the law to [her] findings or to hypothesize the ALJ's justifications that would perhaps find support in the record. *Fox* v. *Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015).

Social Security Ruling 96–8p explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions" listed in the regulations. "Only after that may [residual functional capacity] be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96–8p. The Ruling further explains that the residual functional capacity "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*

There is no "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis[.]" *Mascio*, 780 F.3d at 636. But "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (quoting *Cichocki* v. *Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). The function-by-function requirement can be satisfied by reference to a properly conducted analysis

7

by a state agency consultant. *See, e.g.*, *Linares* v. *Colvin*, No. 5:14-CV-00129, 2015 WL 4389533, at *3 (W.D.N.C. July 17, 2015) ("Because the ALJ based his RFC finding, in part, on the function-by-function analysis of the State agency consultant, the ALJ's function-by-function analysis complied with [Soc. Sec. Ruling] 96–8p." (citing *Lemken* v. *Astrue*, No. 5:07-CV-33-RLV-DCK, 2010 WL 5057130, at *8 (W.D.N.C. July 26, 2010))).

The ALJ found that Fitzmorris can perform light work with a limitation to frequent handling and fingering. Tr. at 22. The RFC includes no non-exertional restrictions and makes no allowance for time off-task, unscheduled breaks, or work absences.

### 2. Subjective Statements

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. SSR 16–3p, 2016 WL 1119029 (Mar. 16, 2016); 20 C.F.R. § 404.1529. First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain. 2016 WL 1119029, at *3; § 404.1529(b).

If the claimant clears this threshold, at the second step the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine how much they limit the claimant's ability to work. *Id.* In making that determination, the ALJ considers the "entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4.

The ALJ has full discretion to weigh the subjective statements with the objective medical evidence and other matters of record. *Craig* v. *Chater*, 76 F.3d 585, 595 (4th Cir. 1996) (holding

8

that claimant's allegations of pain need not be accepted to extent that they conflict with the record). In a district court's review, the ALJ's findings are entitled to great weight because of the ALJ's ability to observe and evaluate testimony firsthand. *Shively*, 739 F.2d at 989–90.

No objective evidence is required in assessing the alleged symptoms at the second step. *Oakes* v. *Kijakazi*, 70 F.4th 207, 215 (4th Cir. 2023) (citing *Arakas*, 983 F.3d at 95). Instead, "a claimant is entitled to 'rely exclusively on subjective evidence to prove that [his] symptoms [are] so continuous and/or severe that they prevented [him] from working[.]'" *Id.* (citing *Arakas*, 983 F.3d at 96); *see also Shelley C.* v. *Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 360 (4th Cir. 2023) (error to discount subjective statements based on objective medical evidence, or a lack of it, where condition may not produce such evidence).

But the ALJ does not have to accept the claimant's statements at face value. *Hawley* v. *Colvin*, No. 5:12-CV-260-FL, 2013 WL 6184954, at *15 (E.D.N.C. Nov. 14, 2013). The ALJ must balance the record evidence, mindful that "inconsistencies in the objective medical evidence is one of the many factors" to consider in evaluating an individual's symptoms. SSR 16–3p, 2016 WL 1119029, at *5.

So although "contradictory evidence may discredit [claimant's] subjective statements . . . a mere absence of medical evidence should not." *Minchew* v. *Kijakazi*, No. 5:22-CV-214-FL, 2023 WL 5919333, at *8 (E.D.N.C. Aug. 21, 2023), *adopted by* 2023 WL 5916528 (E.D.N.C. Sept. 11, 2023); *see William J.* v. *Kijakazi*, Civ. No. 22–2962-BAH, 2023 WL 6518118, at *5 (D. Md. Oct. 5, 2023) ("[W]hile a claimant cannot be required to prove the extent and severity of their subjective complaints with objective evidence, such evidence—if it exists—may still be considered by the ALJ to evaluate those complaints.").

9

The ALJ noted Fitzmorris's impairments could produce the symptoms she claimed. Tr. at 24. But she declined to fully accept Fitzmorris's statements about the intensity, persistence, and limiting effects of her symptoms, to the extent they conflicted with the RFC determination. *Id.*[3]

### 3. Application

Fitzmorris challenges the RFC determination asserting that it failed to account for her persistent fatigue by allowing for additional breaks, absences, or time off-task. Bisignano contends that the ALJ's decision reveals why Fitzmorris's fatigue required no nonexertional limitations. The undersigned disagrees and concludes that the ALJ identified no sound basis to discredit Fitzmorris's fatigue. So the RFC determination may not address all of her symptoms, requiring remand.

The ALJ found that Fitzmorris's lupus, thrombocytopenic purpura, and rheumatoid arthritis were severe impairments. Tr. at 19. Her decision makes four references to Fitzmorris's reports of fatigue, with most mentions of fatigue in conjunction with her other reported symptoms like pain, swelling, and joint stiffness. Tr. at 23–24. There is no analysis of this symptom specifically nor any findings about its severity, frequency, and limiting effects.

Fitzmorris consistently reported her fatigue, characterized as constant and persistent, to her providers. She complained of fatigue at a May 2021 visit to her pain specialist. Tr. at 307. Her provider assessed severe and worsening fatigue. Tr. at 310. Treatment notes reflect she needed

---

[3] Such boilerplate language is problematic because it suggests that the ALJ determined the RFC before assessing the consistency of a claimant's statements. *See Mascio* v. *Colvin*, 780 F.3d 632, 639 (4th Cir. 2015) (error for ALJ to conclude claimant's statements were not credible because they were inconsistent with RFC because it "gets things backwards by implying that ability to work is determined first and is then used to determine the claimant's credibility.") (internal quotation marks omitted). An ALJ should instead compare a plaintiff's alleged functional limitations "to the other evidence in the record, not to [her RFC]." *Id.*

naps, which is a prominent feature of her disease. *Id.* At a follow-up appointment four months later, Fitzmorris stated that she napped intermittently, and had napped over two hours the day before. Tr. at 312.

Fitzmorris's providers again diagnosed her with fatigue in January 2022. Tr. at 651. Three months later, treatment records reveal that she experienced disrupted sleep at night, felt unrested in the mornings, and would fall asleep after 30 minutes of activity. Tr. at 554.

At a consultative psychological evaluation in June 2022, Fitzmorris again reported fatigue. Tr. at 362, 363. Fatigue was also among the side effects of her medication. Tr. at 363. The examiner noted that the medical record corroborated her complaints of fatigue. *Id.* And when she worked, Fitzmorris had napped in her car on breaks. *Id.*

Fitzmorris again complained of fatigue four months later. Tr. at 646. The following month, she requested a steroid to improve her energy level as she was not getting restful sleep. Tr. at 561. Records show that she experienced persistent fatigue and low energy, which made it difficult to get out of bed in the mornings, limited her activities, and interfered with her ability to complete chores. *Id.* Providers again assessed severe and worsening fatigue, remarking that it had been a prominent feature of her disease. Tr. at 566. Her arthritis likely caused the fatigue. *Id.* And the records note that Fitzmorris needed to rest "all the time" because of her fatigue. *Id.*

At a follow-up visit in March 2023, Fitzmorris again reported fatigue, stating that she had no energy to do anything. Tr. at 572, 574. Treatment notes identify fatigue as a symptom associated with lupus. Tr. at 572.[4] Again diagnosing fatigue, providers characterized it as worsening,

---

[4] In addition to fatigue being a regular feature of lupus, Fitzmorris's other severe impairments—idiopathic thrombocytopenic purpura and rheumatoid arthritis—include fatigue as a common symptom. *See* https://www.hopkinsmedicine.org/health/conditions-and-diseases/idiopathic-thrombocytopenic-purpura (last visited Nov. 18, 2025) ("Symptoms of [ITP] may include . . . [f]eeling tired.]"); https://www.mayoclinic.org/diseases-conditions/rheumatoid-arthritis/symptoms-causes/syc-20353648 (last visited Nov. 18, 2025) ("Symptoms of rheumatoid arthritis may include . . . [t]iredness[.]").

11

persistent, and severe, noting it affected Fitzmorris's ability to complete daily activities. Tr. at 576. Four months later, Fitzmorris again complained of fatigue, which had been greater over the past month. Tr. at 580, 582. She experienced severe exhaustion during a flare. Tr. at 580. And providers included fatigue among her diagnoses. Tr. at 585.

Fitzmorris's Function Report also noted her fatigue. She "napped all day" because her pain and other symptoms disrupted her sleep. Tr. at 207. Her husband's Third Party Statement remarked that Fitzmorris would sleep and rest a lot during the day and did not sleep well at night. Tr. at 191.

Fitzmorris's testimony tracked her reports of fatigue to providers. She testified that she was diagnosed with lupus and rheumatoid arthritis around 2013. Tr. at 41–42. Since then, her functioning has decreased and she had trouble sleeping at night. Tr. at 42. Her medications made her sleepy and groggy. Tr. at 43, 44. And Fitzmorris fell asleep after 30 minutes of activity. Tr. at 49. Fitzmorris would lie down after taking her medications. *Id.* She may nap for an hour or two in the morning and take another one to two hour nap in the afternoon. *Id.* Fitzmorris stated that after the hearing, she would go home and probably take a nap. Tr. at 51.

The Vocational Expert testified that a person absent from work more than one day a month or off-task more than ten percent of the workday would be unemployable. Tr. at 57–58.

Fitzmorris's daily activities do not undermine her fatigue symptoms. The ALJ noted no vigorous physical activities. Instead, many of Fitzmorris's activities—reading, watching television, talking on the phone, using the computer, spending time with others—can be described as undemanding.

Although Fitzmorris shopped, she did not do so in a store but online, using store-pickup. Tr. at 193, 209. She no longer made big meals, preparing only simple ones. Tr. at 192, 208. And Fitzmorris reported that her fatigue interrupted her ability to complete tasks, so she could no longer

12

engage in activities with her family. Tr. at 194, 197. So her "numerous activities" the ALJ noted are not inconsistent with Fitzmorris's fatigue symptoms. *See Woods* v. *Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) ("An ALJ may not consider the type of activities a claimant can perform without considering the extent to which she can perform them.") (citation omitted).

The ALJ found that Fitzmorris's lupus was a severe impairment. But despite the ample evidence of her fatigue and its effect of Fitzmorris's functioning, the ALJ did not examine this symptom, offer reasons why her well-documented fatigue caused no nonexertional restrictions in the RFC determination, or explain why Fitzmorris's statements about fatigue were unpersuasive.

The analysis glosses over her fatigue, referencing it among the symptoms she reported. The ALJ did not examine the effects of Fitzmorris's fatigue on her functioning. And the decision discloses no basis to discount her statements about fatigue and how it limited her. So contrary to the Commissioner's contention, the decision does not elucidate a path from the evidence to the ALJ's conclusions.

With no analysis of evidence supporting or contradicting Fitzmorris's claims about fatigue, the RFC concluded that she could perform the exertional demand associated with light work with no nonexertional restrictions. How the ALJ reached this determination, or upon what evidence she based these findings, is unclear. *See Thomas* v. *Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019) ("[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion . . . [M]eaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion." (citing *Woods*, 888 F.3d at 694)). The lack of analysis frustrates meaningful review and supports remand. *See Blake* v. *O'Malley*, No. 5:23-CV-486, 2024 WL 3888910 (E.D.N.C. Aug. 24, 2024) (noting the general rule that remand is not required where ALJ

fails to perform function-by-function analysis applies only when ALJ sufficiently explains her conclusions with evidence for the record to explain RFC determination) (citations omitted).

Lacking an explanation of why the ALJ declined to endorse Fitzmorris's statements of fatigue, it is unclear if she overlooked this symptom or found that the record did not support it. Because the RFC neither accounts for Fitzmorris's fatigue nor explains why limitations are unnecessary, it is uncertain whether the RFC determination properly reflects all of her well-supported limitations. *See Hernandez* v. *Kijakazi*, No. 5:21-CV-267-RN (E.D.N.C. Sept. 13, 2022), Mem. & Order at 16–17, D.E. 32 (remanding case when ALJ's "decision lacks any explanation of why [the claimant's] reports of fatigue did not result in functional limitations.").

In sum, the court cannot conclude that substantial evidence supports the RFC determination. So this issue warrants additional consideration on remand.

### III. Conclusion

For these reasons, the undersigned recommends that the court grant Fitzmorris's request for relief (D.E. 13), deny Bisignano's request for relief (D.E. 15), and remand this matter to the Commissioner for further consideration.

The Clerk of Court must serve a copy of this Memorandum and Recommendation (M&R) on each party who has appeared in this action. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will

have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated: November 24, 2025

_____
Robert T. Numbers, II
United States Magistrate Judge